1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JONATHAN GRIGSBY,                        No.  2:14-cv-0789 GEB AC P

12                    Plaintiff,

13         v.                                 ORDER AND FINDINGS AND
                                              RECOMMENDATIONS
14   M. MUNGUIA, et al.,

15                    Defendants.

16

17         Plaintiff is a state prisoner proceeding pro se and in forma pauperis with an action filed

18   pursuant to 42 U.S.C. § 1983.  Currently pending before the court are: (1) plaintiff's motion to

19   compel discovery; (2) plaintiff's motion to extend discovery; (3) plaintiff's motion for

20   appointment of counsel; and (4) defendants' motion for summary judgment.

21         I.      Allegations of the Complaint

22         This case proceeds on plaintiff's original complaint, ECF No. 1.  Plaintiff alleges that

23   defendant correctional officers Baker, Fairbanks/Balque,[1] Lee, Munguia, and Serrano violated

24   plaintiff's rights under the Eighth Amendment by using excessive force against him on October

25   10, 2012.  Specifically, plaintiff alleges that as he was walking on crutches towards his group

26   room, Officer Munguia told plaintiff to return to his group room.  See ECF No. 1 at 4.  Plaintiff

27   _____

28   [1]  Defendant Balque's name has been changed to Fairbanks.  For clarity, the court refers to her as
     "Fairbanks/Balque."

                                                 1

1    turned around and said, "I'm moving as fast as I can."  Munguia then pepper sprayed plaintiff in

2    the face, blinding him.  Id.  Munguia knocked plaintiff's crutches out of his hands, told plaintiff to

3    submit to handcuffs, and placed plaintiff in a choke hold.  Defendants Serrano, Fairbanks/Balque,

4    and Lee started hitting plaintiff with iron batons until he was "black and blue" and his leg was

5    broken.  Id. at 5.  While plaintiff was lying on the ground, defendant Baker kneed plaintiff in his

6    eye for no reason.  Id. at 4.  Plaintiff was then handcuffed with his hands behind his back and

7    "hog tied," causing plaintiff extreme pain in his injured leg.  Id.  Plaintiff alleges that as a result

8    of this incident, he received a large knot on his head, was temporarily blinded by pepper spray,

9    was choked unconscious, and suffered a broken kneecap.  Id. at 4-5.

10       II.      Background Relevant to Plaintiff's Discovery Motions

11           The discovery deadline in this case expired on April 17, 2015.  On April 14, 2015,[2]

12   plaintiff filed a motion to compel discovery, seeking production of: (1) a video of plaintiff's

13   October 10, 2012 "excessive force interview;" (2) a video of plaintiff's interview with Lieutenant

14   Hobart ("Lt. Hobart video"), conducted in November or December 2012; and (3) Lt. Hobart's

15   incident report.  ECF No. 42.  Plaintiff also requested an extension of time to conduct discovery.

16           By order dated May 28, 2015, plaintiff's motion to compel was denied in part and granted

17   in part.  ECF No. 46.  Plaintiff's request for production of the October 10, 2012 video was denied

18   as moot because defendants offered documentation that plaintiff had since been permitted to view

19   the video.  Plaintiff's request for production of the Lt. Hobart video was granted to the extent that

20   defendants were required to produce the video to plaintiff if it was in their possession, custody, or

21   control.  In light of defendants' assertion that they conducted a search for the Lt. Hobart video,

22   the court directed defendants to file a statement detailing their efforts to locate the video, in order

23   to allow the court to determine if the search conducted was sufficiently diligent.[3]  As to the Lt.

24   Hobart incident report, the court declined to rule on plaintiff's motion because it was unclear

25   whether plaintiff had previously requested the incident report from defendants.  The court granted

26   _____

     [2]  Since plaintiff is proceeding pro se, he is afforded the benefit of the prison mailbox rule.  See
27   Houston v. Lack, 487 U.S. 266, 276 (1988).
     [3]  In the alternative, defendants were given the option to file a declaration confirming that plaintiff
28   had been permitted to see the Lt. Hobart video.  ECF No. 46 at 11.

plaintiff leave to file a supplemental statement in support of his motion to compel production of this report.  Plaintiff was advised that in his motion, he should explain whether he previously requested the report from defendants, how defendants responded, and why defendants' response was unjustified.  Also in the May 28, 2015 order, the court denied plaintiff's request for an extension of the discovery deadline without prejudice.  Plaintiff was granted leave to file a new motion explaining what additional discovery he intended to serve on defendants and why he was unable to serve the requests prior to the April 17, 2015 deadline.  To the extent plaintiff sought production of discovery he already served on defendants, plaintiff was granted leave to file an untimely motion to compel in lieu of extending the discovery deadline.

On May 17, 2015, plaintiff filed a second motion to compel, which was filed by the clerk on May 26, 2015.[4]  ECF No. 45.  In this motion, which is currently pending before the court, plaintiff indicates that he was permitted to view the October 10, 2012 video, but asserts that the video has been altered.  Id. at 1.  Plaintiff also asserts that defendants have not produced the Lt. Hobart video.  Id. at 2.

On June 4, 2015, defendants filed their response to the court's May 28, 2015 order.  ECF No. 47.  In their response, defendants indicate that they conducted a search for the Lt. Hobart video and were unable to find it.  Id. at 2.  Attached to their response is a declaration describing counsel's efforts to locate the video.  Id. at 4-5.

On June 12, 2015, defendants opposed plaintiff's second motion to compel.  ECF No. 48. In their motion, defendants again assert that they cannot find the Lt. Hobart video.  With respect to the October 10, 2012 video, defendants assert that plaintiff has no evidence that the video has been tampered with.  Id. at 1-2.

On June 9, 2015, plaintiff filed a motion to extend the discovery deadline, which was docketed on June 22, 2015.  ECF No. 49.  Plaintiff's motion also includes a "supplemental statement and motion to compel."  Id. at 2.  Both motions are related to plaintiff's efforts to compel production of the Lt. Hobart video and Lt. Hobart's related notes and incident report.

---

[4]  Plaintiff's second motion to compel was filed before he received the court's order addressing his first motion to compel.

On June 19, 2015, plaintiff filed a reply to defendants' response to the court's May 28, 2015 order. ECF No. 50. In his reply, plaintiff again asserts that the October 10, 2012 video has been altered and that the Lt. Hobart video and incident report have been concealed from him or have been destroyed. Id. at 2-3.

On July 6, 2015, defendants opposed plaintiff's motion to extend the discovery deadline and motion to compel discovery. ECF No. 51.

On July 17, 2015, defendants filed a motion for summary judgment. ECF No. 52. Plaintiff opposed the motion, ECF Nos. 57 and 59, and defendants replied, ECF No. 60. Plaintiff also filed motions requesting appointment of counsel, a settlement conference, and a writ of habeas corpus ad testificandum. ECF Nos. 58, 61, 62.

III.    Motions to Compel

As noted above, plaintiff filed two motions to compel, which are now before the court. Plaintiff seeks production of (1) the October 10, 2012 video of his "excessive force interview;" (2) the Lt. Hobart video; and (3) the Lt. Hobart incident report. Because the motions address the same three issues, the court has consolidated the parties' arguments and will address plaintiff's production requests by issue rather than by motion.[5]

A.    October 10, 2012 Video

Plaintiff asserts that he was permitted to view the October 10, 2012 video of his "excessive force interview," but claims that it has been "shortened" by defendants. ECF No. 45. Specifically, plaintiff asserts that the video must have been altered because in the video plaintiff references the injury to his eye and the "big knot" on his head, but does not mention his "broken leg."[6] Id. at 1. Defendants oppose plaintiff's motion, arguing that plaintiff has no evidence the video has been tampered with.[7] ECF No. 48 at 2.

---

[5] The discovery requests at issue here are not material to the court's resolution of defendants' motion for summary judgment.

[6] Plaintiff also appears to allege that he was given a drug before the interview to make him sleepy, see ECF No. 45 at 1, but it is not clear how this supports his allegation that the video has been altered.

[7] Defendants also argue that the motion to compel is untimely. ECF No. 48 at 1-2. As plaintiff did not view the video until May 1, 2015, see ECF No. 44 at 3, after the discovery deadline had

4

As the court understands it, the October 10, 2012 video depicts plaintiff being interviewed regarding the alleged incident of excessive force that forms the basis of the instant complaint. Plaintiff believes that the October 10, 2012 video was altered or edited because he made statements about his knee injury during the interview, which are not depicted in the video.  As plaintiff has personal knowledge of what he said during the interview, these allegations provide some support for his contention that the video has been altered.

Because defendants do not explicitly state in their opposition that the video has not been altered, the court will direct defendants to file a supplemental response.  Within twenty-one days of adoption of the below findings and recommendations by the district judge, defendants shall file a declaration with the court indicating whether the October 10, 2012 video was altered or edited before plaintiff was permitted to view it.  Plaintiff's motion to compel a further response regarding the October 10, 2012 video is otherwise denied.

B. Lt. Hobart Video

Plaintiff moves to compel production of the Lt. Hobart video.  According to plaintiff, he was interviewed by Lt. Hobart in connection with his claims of excessive force stemming from the October 10, 2012 incident.  Plaintiff alleges that the interview with Lt. Hobart took place in November or December 2012. ECF No. 45 at 2.  Plaintiff has provided a copy of an inmate appeal he filed requesting access to the Lt. Hobart video. ECF No. 49 at 17-18.  In the appeal, plaintiff states that the interview with Lt. Hobart took place on November 2, 2012. See id. at 18.

Defendants assert that they conducted a search for the Lt. Hobart video and have been unable to locate it. ECF No. 48 at 2; ECF No. 47 at 2.  Counsel for defendants filed a declaration with the court explaining that she contacted the Litigation Coordinator at California State Prison-Sacramento, the Litigation Coordinator at the Office of Internal Affairs, and a sergeant from the Investigative Services Unit. ECF No. 47 Exh. 1 at 4-5.  Counsel's search revealed that one use of force video was placed in the evidence locker on October 10, 2012. Id. at 5.  None of the parties contacted were able to locate a DVD of a second interview of plaintiff. Id. at 5.

expired, the court declines to deny the motion on timeliness grounds.

1     While plaintiff speculates that the Lt. Hobart video has been hidden or destroyed, counsel

2    for defendants has declared under penalty of perjury that she has been unable to locate the video

3    despite a diligent search.  The court has reviewed counsel's declaration and finds the search

4    conducted for the Lt. Hobart video to be sufficiently diligent.  Under these circumstances, the

5    court cannot compel further production of the Lt. Hobart video from defendants.  Defendants

6    cannot be compelled to produce a video they do not have.  Accordingly, plaintiff's motion to

7    compel production of the Lt. Hobart video is denied.

8     To the extent plaintiff asserts that his case cannot go forward without the Lt. Hobart video

9    because it provides documentation of plaintiff's account of the October 10, 2012 events, plaintiff

10   is advised that he will be able to provide this information in the form of his own direct testimony

11   should this case proceed to trial.

12       C.  Lt. Hobart Report

13     Plaintiff initially sought production of the Lt. Hobart report in his first motion to compel,

14   ECF No. 42.  The court considered plaintiff's arguments, but declined to rule on plaintiff's

15   production request because it was unclear whether plaintiff had requested the report from

16   defendants prior to filing his motion to compel.  See ECF No. 46 at 9-10.  Specifically, it was not

17   clear if the Lt. Hobart report was the same as the "excessive use of force report done by CDCR,"

18   which plaintiff requested from defendants on February 27, 2015.  Id. at 9.  Thus, plaintiff was

19   permitted to file a supplemental statement in support of his motion to compel to compel

20   production of the incident report.  Plaintiff was directed to reproduce the written discovery

21   request he sent to defendants and to inform the court how defendants responded to his request.

22   Id. at 9-10.

23     In his supplemental statement, plaintiff explains what the Lt. Hobart report is,[8] but does

24   not reproduce his discovery request.  See ECF No. 49 at 2-3.  He does, however, state that

25

26   [8]  Plaintiff explains that he filed a grievance regarding the excessive force incident on October 10,
2012.  The first level response to his grievance, attached as Exhibit 1 to plaintiff's statement,

27   indicates that plaintiff was interviewed by Sgt. Norton on December 28, 2012 regarding his
grievance.  Plaintiff states that he was not interviewed by Sgt. Norton, but by Lt. Hobart.  Lt.

28   Hobart wrote a report regarding the details of plaintiff's appeal inquiry.  See ECF No. 49 at 2-3.

defendants "purposely left [the report] out of production of documents." Id. at 2.  Plaintiff also speculates that the report may have now been "thrown out" or erased.  See id. at 3.

Defendants oppose plaintiff's motion to compel production of the report on the grounds that plaintiff has failed to specify which discovery request is at issue and why defendants' responses were inadequate.  ECF No. 51 at 3.

In considering the relative positions of the parties, the court is mindful that "[u]nder the liberal discovery principles of the Federal Rules[,] defendants [are] required to carry a heavy burden of showing why discovery was denied." Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975).  In addition, pro se litigants are not held to the same standards as attorneys.  See Walker v. Karela, 2009 WL 3075575, *1 (E.D. Cal. 2009).  The court takes care to "liberally construe the inartful pleading of pro se litigants," Ferdik v. Bonzelet, 963 F.2d 1258, 1261 (9th Cir. 1992) (quotations omitted), and "to ensure that pro se litigants do not lose their right to a hearing on the merits of their claim due to ignorance of technical procedural requirements," Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1988).

The court has reviewed plaintiff's supplemental statement, ECF No. 49, together with his initial motion to compel production of the Lt. Hobart report, ECF No. 42.  Construed broadly, plaintiff's description of the Lt. Hobart report suggests that this report is the same as the "excessive use of force report" plaintiff initially requested from defendants on February 27, 2015. Defendants objected on the grounds that the request was untimely and noted that the request should have been served by February 16, 2015.  See ECF No. 44-1 at 13.

The court will not permit plaintiff, a prisoner proceeding pro se, to lose his opportunity to be heard due to his ignorance of technical requirements.  The court will not allow defendants to deny plaintiff's production request on the ground that it was eleven days late.  Accordingly, the court will address the merits of plaintiff's motion to compel production of the Lt. Hobart report. See Marti v. Baires, 2012 WL 2029720, *3 (where the discovery request seeks information which, based on the record, is clearly within the scope of discovery and the objection lacks merit, the court may elect to exercise its discretion to reach the merits of the dispute).

////

1    Under Federal Rule of Civil Procedure 26(b)(1), parties may obtain discovery regarding

2    any nonprivileged matter that is relevant to any party's claim or defense and proportional to the

3    needs of the case.  Fed. R. Civ. P. 26(b)(1).  Here, plaintiff alleged that CDCR's excessive use of

4    force report is relevant to his excessive use of force claim because it reflects plaintiff's account of

5    the October 10, 2012 incident, as told to Lt. Hobart in 2012.  See ECF No. 49 at 2-4.  Plaintiff

6    also appears to allege that the report contains other information that was uncovered during

7    investigation of his appeal.  See id. at 2-3.  As plaintiff claims that the subject of the report is his

8    excessive use of force claim, which is also the subject of the instant lawsuit, the court finds that

9    the report is relevant to plaintiff's claim and is discoverable.  See Fed. R. Civ. P. 26(b)(1).

10    Accordingly, defendants shall be required to produce the excessive use of force report regarding

11    the October 10, 2012 incident to plaintiff.  Defendants shall produce the report to plaintiff within

12    twenty-one days of the adoption of the below findings and recommendations by the district judge.

13    IV.    Motion to Extend Discovery

14    Plaintiff requests an extension of the discovery deadline.  In his motion, plaintiff does not

15    identify any new discovery requests he intends to serve on defendants, but asserts that he needs

16    more time to figure out why defendants are concealing the Lt. Hobart video and the related notes

17    and report.  As plaintiff has been previously advised, this issue is properly raised in a motion to

18    compel, which plaintiff has already filed.  Because plaintiff has not identified any *new* discovery

19    requests that he intends to serve on defendants, the court does not find good cause to extend the

20    discovery deadline.  Plaintiff's request for additional time to conduct discovery is therefore

21    denied.

22    V.    Motion for Appointment of Counsel

23    Plaintiff has requested appointment of counsel.  In his motion, plaintiff asserts that

24    appointment of counsel is warranted because he has limited legal knowledge and has been having

25    trouble obtaining the Lt. Hobart video and other related documents from defendants.  ECF No. 58

26    at 1-2.

27    The United States Supreme Court has ruled that district courts lack authority to require

28    counsel to represent indigent prisoners in § 1983 cases.  Mallard v. United States Dist. Court, 490

8

U.S. 296, 298 (1989).  In certain exceptional circumstances, the district court may request the voluntary assistance of counsel pursuant to 28 U.S.C. § 1915(e)(1).  Terrell v. Brewer, 935 F.2d 1015, 1017 (9th Cir. 1991); Wood v. Housewright, 900 F.2d 1332, 1335-36 (9th Cir. 1990).

The test for exceptional circumstances requires the court to evaluate the plaintiff's likelihood of success on the merits and the ability of the plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved.  See Wilborn v. Escalderon, 789 F.2d 1328, 1331 (9th Cir. 1986); Weygandt v. Look, 718 F.2d 952, 954 (9th Cir. 1983).  When determining whether "exceptional circumstances" exist, the court must consider plaintiff's likelihood of success on the merits as well as the ability of the plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved.  Palmer v. Valdez, 560 F.3d 965, 970 (9th Cir. 2009). The burden of demonstrating exceptional circumstances is on the plaintiff.  Id.  Circumstances common to most prisoners do not establish exceptional circumstances.

In the present case, the court does not find the required exceptional circumstances at this time.  Plaintiff's excessive force claim in not particularly complex and plaintiff has thus far been able to articulate his claims pro se.  Plaintiff's limited legal knowledge and discovery disputes with defendants are circumstances common to most prisoners that do not warrant appointment of counsel.  Therefore, plaintiff's request for appointment of counsel will be denied without prejudice.

VI.    Motion for Summary Judgment

The court now turns to defendants' motion for summary judgment.  ECF No. 52. Defendant Baker moves for summary judgment on the grounds that plaintiff's claims against defendant Baker are unexhausted.  All defendants move for summary judgment on the grounds that they did not violate plaintiff's rights under the Eighth Amendment and alternatively that they are entitled to qualified immunity.

A.   Summary Judgment Standards

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden

9

1   of proving the absence of a genuine issue of material fact." <u>In re Oracle Corp. Sec. Litig.</u>, 627

2   F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  The

3   moving party may accomplish this by "citing to particular parts of materials in the record,

4   including depositions, documents, electronically stored information, affidavits or declarations,

5   stipulations (including those made for purposes of the motion only), admission, interrogatory

6   answers, or other materials" or by showing that such materials "do not establish the absence or

7   presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

8   support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

9        "Where the non-moving party bears the burden of proof at trial, the moving party need

10   only prove that there is an absence of evidence to support the non-moving party's case." <u>Oracle</u>

11   <u>Corp.</u>, 627 F.3d at 387 (citing <u>Celotex</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P. 56(c)(1)(B).

12   Indeed, summary judgment should be entered, "after adequate time for discovery and upon

13   motion, against a party who fails to make a showing sufficient to establish the existence of an

14   element essential to that party's case, and on which that party will bear the burden of proof at

15   trial." <u>See Celotex</u>, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential

16   element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> at 323.

17   In such a circumstance, summary judgment should be granted, "so long as whatever is before the

18   district court demonstrates that the standard for entry of summary judgment, as set forth in Rule

19   56(c), is satisfied." <u>Id.</u>

20        If the moving party meets its initial responsibility, the burden then shifts to the opposing

21   party to establish that a genuine issue as to any material fact actually does exist. <u>See Matsushita</u>

22   <u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  In attempting to establish

23   the existence of this factual dispute, the opposing party may not rely upon the allegations or

24   denials of its pleadings but is required to tender evidence of specific facts in the form of

25   affidavits, and/or admissible discovery material, in support of its contention that the dispute

26   exists. <u>See</u> Fed. R. Civ. P. 56(c)(1); <u>Matsushita</u>, 475 U.S. at 586 n.11.  Moreover, "[a] Plaintiff's

27   verified complaint may be considered as an affidavit in opposition to summary judgment if it is

28   based on personal knowledge and sets forth specific facts admissible in evidence." <u>Lopez v.</u>

1   Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).[9]

2        The opposing party must demonstrate that the fact in contention is material, i.e., a fact

3   "that might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby,

4   Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d

5   626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a

6   reasonable jury could return a verdict for the nonmoving party," Anderson, 447 U.S. at 248.

7        In the endeavor to establish the existence of a factual dispute, the opposing party need not

8   establish a material issue of fact conclusively in its favor.  It is sufficient that "'the claimed

9   factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

10  truth at trial.'"  T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. V. Cities

11  Serv. Co., 391 U.S. 253, 288-89 (1968).  Thus, the "purpose of summary judgment is to pierce the

12  pleadings and to assess the proof in order to see whether there is a genuine need for trial."

13  Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

14       "In evaluating the evidence to determine whether there is a genuine issue of fact," the

15  court draws "all inferences supported by the evidence in favor of the non-moving party."  Walls

16  v. Cent. Costa Cnty. Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's

17  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

18  v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine

19  issue, the opposing party "must do more than simply show that there is some metaphysical doubt

20  as to the material facts."  Matsushita, 475 U.S. at 586 (citations omitted).  "Where the record

21  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

22  'genuine issue for trial.'"  Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

23  In applying these rules, district courts must "construe liberally motion papers and pleadings filed

24  by pro se inmates and . . . avoid applying summary judgment rules strictly."  Thomas v. Ponder,

25  611 F.3d 1144, 1150 (9th Cir. 2010).  However, "[if] a party fails to properly support an assertion

26  of fact or fails to properly address another party's assertion of fact, as required by Rule 56(c), the

27

28  [9]  Plaintiff filed a verified complaint in this case.  See ECF No. 1.

1  court may . . . consider the fact undisputed for purposes of the motion …."  Fed. R. Civ.

2  P. 56(e)(2).

3          B.  Exhaustion as to Defendant Baker

4       Because a finding that plaintiff failed to exhaust administrative remedies with respect to

5  defendant Baker would require dismissal of plaintiff's Eighth Amendment claims against him, the

6  court first addresses defendant Baker's non-exhaustion argument.

7          i.  Legal Standards Governing Exhaustion

8       The Prison Litigation Reform Act (PLRA) requires that prisoners exhaust "such

9  administrative remedies as are available" before commencing a suit challenging prison

10  conditions.  42 U.S.C. § 1997e(a).  Regardless of the relief sought, a prisoner must pursue an

11  appeal through all levels of a prison's grievance process as long as some remedy remains

12  available.  "The obligation to exhaust 'available' remedies persists as long as *some* remedy

13  remains 'available.'  Once that is no longer the case, then there are no 'remedies . . . available,'

14  and the prisoner need not further pursue the grievance."  Brown v. Valoff, 422 F.3d 926, 935 (9th

15  Cir. 2005) (original emphasis) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)).  Hence, "[a]n

16  inmate has no obligation to appeal from a grant of relief, or a partial grant that satisfies him, in

17  order to exhaust his administrative remedies."  Harvey v. Jordan, 605 F.3d 681, 685 (9th Cir.

18  2010).

19       The PLRA also requires that prisoners, when grieving their appeal, adhere to CDCR's

20  "critical procedural rules."  Woodford v. Ngo, 548 U.S. 81, 91 (2006).  "The level of detail

21  necessary in a grievance to comply with the grievance procedures will vary from system to

22  system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the

23  boundaries of proper exhaustion."  Jones v. Bock, 549 U.S. 199, 218 (2007).

24       In California, CDCR regulations permit a prisoner to grieve or "appeal" any action or

25  inaction by prison staff that has "a material adverse effect upon his or her health, safety, or

26  welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  An inmate must file the initial appeal within 30

27  calendar days of the action being appealed, and he must file each administrative appeal within 30

28  calendar days of receiving an adverse decision at a lower level.  15 Cal. Code Regs. § 3084.8(b).

The appeal process is initiated by the inmates filing of a "Form 602," the "Inmate/Parolee Appeal Form," "to describe the specific issue under appeal and the relief requested." Id. § 3084.2(a).  As of January 28, 2011, an inmate "shall list all staff member(s) involved and describe their involvement in the issue." Id. § 3084.2(a)(3).  This instruction further provides, id.:

> To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal.  If the inmate or parolee does not have the requested identifying information about the staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question.

Each prison is required to have an "appeals coordinator" whose job is to "screen all appeals prior to acceptance and assignment for review." Cal. Code Regs. tit. 15, § 3084.5(b). The appeals coordinator may refuse to accept an appeal, and she does so either by "rejecting" or "canceling" it. Id. § 3084.6(a).  According to the regulations, "a cancellation or rejection decision does not exhaust administrative remedies." Id. § 3084.1(b).  If the appeals coordinator allows an appeal to go forward, the inmate must pursue it through the third level of review before it is deemed "exhausted." Id. § 3084.1(b) ("all appeals are subject to a third level of review, as described in section 3084.7, before administrative remedies are deemed exhausted").

The Ninth Circuit Court of Appeals recently held that if a prisoner fails to comply with a prison's procedural requirements in pursuing his appeal but prison officials address the merits of the appeal nevertheless, then the prisoner is deemed to have exhausted his available administrative remedies. See Reyes v. Smith, 810 F. 3d 654 (9th Cir. 2016).  As stated by the Court of Appeals, "if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process," then the prisoner has exhausted "such administrative remedies as are available" under the PLRA. Reyes, 810 F. 3d at 658.

The Ninth Circuit has laid out the analytical approach to be taken by district courts in assessing the merits of a motion for summary judgment based on the alleged failure of a prisoner to exhaust his administrative remedies.  As set forth in Albino v. Baca, 747 F.3d 1162, 1172 (9th

13

1    Cir. 2014), cert. denied sub nom. <u>Scott v. Albino</u>, 135 S. Ct. 403 (2014) (citation and internal

2    quotations omitted):

3             [T]he defendant's burden is to prove that there was an available
      administrative remedy, and that the prisoner did not exhaust that
4             available remedy. . . . Once the defendant has carried that burden,
      the prisoner has the burden of production.  That is, the burden shifts
5             to the prisoner to come forward with evidence showing that there is
      something in his particular case that made the existing and
6             generally available administrative remedies effectively unavailable
      to him.  However, . . . the ultimate burden of proof remains with the
7             defendant.

8

9             If a court concludes that a prisoner failed to exhaust his available administrative remedies,

10   the proper remedy is dismissal without prejudice.  <u>See</u> <u>Jones v. Bock</u>, 549 U.S. 199, 223-24

11   (2010); <u>Lira v. Herrera</u>, 427 F.3d 1164, 1175-76 (9th Cir. 2005).

12                            ii.   <u>Arguments of the Parties Regarding Exhaustion</u>

13                                 1.   <u>Defendant</u>

14            Defendant Baker argues that he is entitled to summary judgment because plaintiff failed to

15   exhaust administrative remedies with respect to defendant Baker prior to filing suit.  ECF No. 52

16   at 3-4.  Specifically, defendant argues that plaintiff failed to name Baker in his administrative

17   appeal, as required by the applicable regulations.  Because plaintiff's appeal did not name Baker

18   or include any allegations of wrongdoing by Baker, defendant Baker argues that he is entitled to

19   summary judgment. [10]

20                                 2.   <u>Plaintiff</u>

21            At the outset, the court notes that plaintiff has failed to comply with Federal Rule of Civil

22   Procedure 56(c)(1)(A), which requires that "a party asserting that a fact . . . is genuinely disputed

23   must support the assertion by . . . citing to particular parts of materials in the record . . . ."

24   Plaintiff has also failed to file a separate statement of disputed facts, as required by Local Rule

25   260(b).

26

27   [10]  Because <u>Reyes v. Smith</u>, 810 F. 3d 654, was decided after defendants' motion for summary
      judgment was filed, neither party has addressed whether <u>Reyes</u> affects defendant Baker's
28   exhaustion argument.

                                                        14

It is well-established that the pleadings of pro se litigants are held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam).  Nevertheless, "[p]ro se litigants must follow the same rules of procedure that govern other litigants." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987), overruled on another ground by Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc).  However, the unrepresented prisoners' choice to proceed without counsel "is less than voluntary" and they are subject to the "handicaps . . . detention necessarily imposes upon a litigant," such as "limited access to legal materials" as well as "sources of proof." Jacobsen v. Filler, 790 F.2d 1362, 1364-65 & n.4 (9th Cir. 1986).  Inmate litigants, therefore, should not be held to a standard of "strict literalness" with respect to the requirements of the summary judgment rule. Id.

The court is mindful of the Ninth Circuit's more overarching caution in this context, as noted above, that district courts are to "construe liberally motion papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  Accordingly, the court considers the record before it in its entirety despite plaintiff's failure to be in strict compliance with the applicable rules.  However, only those assertions in the opposition which have evidentiary support will be considered.

In his opposition, plaintiff asserts that he exhausted all available administrative remedies. See ECF No. 59 at 1-6.  Because plaintiff apparently believed that *all* defendants moved for summary judgment on exhaustion grounds, the majority of plaintiff's opposition is dedicated to explaining that an error was made in processing his grievances at the third level of review and that he did in fact exhaust his appeals through the third level.  See id.  As to defendant Baker, plaintiff asserts that he mentioned defendant Baker when he was interviewed by Lt. Hobart regarding the excessive force incident.  Id. at 3.  Although it is not entirely clear, plaintiff appears to assert that the video of the excessive force interview should have been part of his appeal package at the first or second level of review.  See id.

iii.  Material Facts Pertaining to Exhaustion

- Plaintiff's complaint alleges that defendants Baker, Fairbanks/Balque, Lee, Munguia, and Serrano used excessive force against plaintiff on October 10, 2012, in violation of

plaintiff's Eighth Amendment rights.  ECF No. 1.

- Plaintiff submitted an administrative appeal regarding the October 10, 2012 incident.[11] Defendants' Statement of Undisputed Facts ("Facts"), ECF No. 53 at 2.  The signature date on this appeal is November 9, 2012.  ECF No. 59 Exh. 2 at 19-20.  The appeal was assigned appeal log number SAC-B-12-03537.  See id.

- In Section A of plaintiff's November 9, 2012 appeal, plaintiff describes his grievance "issues" as follows:

> (1) On October 10, 2012 while in the EOP treatment center on B facility I approached officer Lee and asked her if she would hire me to work for her, she responded I had no experience, (2) I then stated I use to work for c/o Serrano and Sgt. Whitfield, c/o Serrano then stated, "I stole canteen from EOP inmates," I replied she's a liar, I saw her coming out the old treatment center after having sex with c/o Mendoza.  (3) C/o Munguia the repeatedly told me to take my thiefen ass to my group room.  (4) I had a sprain ankle and was using crutches and told him I was moving as fast as I can.  (5) He comments, "It wasn't fast enough and sprayed me with his MK-9 pepper spray directly in my face, then placed me in a choke hold until I lost consciousness (briefly).  When I came too, c/o's Lee, Balque, Serrano all were beaten me with their batons with such violent force they broke my leg [*illegible*] already back issue and head injurys and still I'm in pain.

ECF No. 59 at 19-20.

- In Section B of the appeal, plaintiff sought the following relief:

> (A ) That I be assigned an investigator who will provide me all names of staff and witnesses who were in the treatment center as potential witnesses to excessive force incident.  (B) That all staff and inmates who were in the treatment center will be interviewed regarding to what they witnessed and I be provided with a copy of each of their statements.  (C) That I be provided an explanation why photos of my injuries to my head, leg, back were not taken, nor why staff and inmates have not been interviewed as evidence in this excessive force case, as part of procedure.  (D) That Lee, Munguia, Serrano, and Balque be investigated and reprimanded for the injurys they unlawfully inflicted upon me and award me $150,000 for pain and suffering.

ECF No. 59 at 19-20.

- Defendant Baker is not named in plaintiff's November 9, 2012 appeal.  ECF No. 59 Exh. 2 at 19-20; Facts ¶ 10.

---

[11] Where, as here, defendant's Undisputed Facts are supported by the submitted evidence, and not contested by plaintiff, the court cites only to the relevant paragraph of defendant's Undisputed Facts.

16

- As a result of the incident on October 10, 2012, plaintiff was charged with a disciplinary violation. See ECF No. 1-2 at 11-12. The rules violation report dated November 16, 2012 indicates that defendant Baker gave the following statement regarding the October 10, 2012 incident, which was used as evidence at plaintiff's disciplinary hearing:

> I noticed several officers in a physical altercation with inmate GRIGSBY. I was able to identify that Officer Munguia had GRIGSBY'S left arm behind his back and had placed a handcuff restraint on his left wrist. GRIGSBY was refusing to place his right hand behind his back. I grabbed GRIGSBY'S right arm using my hands and pulled it from underneath him and placed it behind his back.
>
> Id.

- Plaintiff's November 9, 2012 grievance was processed as a staff complaint. See ECF No. 59 at 21. On December 28, 2012, plaintiff's appeal was partially granted at the first level of review in that an appeal inquiry was completed. ECF No. 59 Exh. 2 at 21-22. The "appeal issue" states, "You are alleging that on October 10, 2012, Correctional Officers Munguia, Lee, Balque, and Serrano all used excessive force on you." Id. at 21. The response to plaintiff's appeal indicates that plaintiff was interviewed on December 28, 2012 by Sgt. Norton and that plaintiff stated that "the Officers used excessive force."[12] Id. at 21. The appeal response states that staff did not violate CDCR policy. Id. at 21.

- In a letter dated February 20, 2013, plaintiff was informed that his third level appeal was rejected because he had bypassed the second level of review. See ECF No. 59 Exh. 2 at 31.

- Plaintiff submitted another administrative grievance, explaining that he submitted his grievance to the third level of review because he was under the impression that the December 28, 2012 response satisfied both the first and second level of review. See ECF No. 53-1 at 17-18. The signature date on this appeal is February 28, 2013. Id. In this grievance, plaintiff asserts that he was not interviewed by Sgt. Norton in connection with his first level appeal. Plaintiff goes on to assert that he was assaulted by four officers who "broke [his] knee cap, gave [him] a head concussion, back injury and black and blue bruises on his legs and body." ECF No. 53-1 at 17-18. Defendant Baker is not named in plaintiff's February 28, 2013 appeal. See id.

- On July 19, 2013, plaintiff's November 9, 2012 appeal was denied at the third level of review. Facts ¶ 11. ECF No. 53-1 at 20-21.

- In his deposition, plaintiff stated that the appeal he filed regarding the October 10, 2012 incident was appeal number 12-03637 and that it was submitted on November 9, 2012. ECF No. 53-1 at 35. When asked if he submitted any additional 602's regarding the October 10, 2012 incident, plaintiff responded, "I don't believe so." Id.

////

---

[12] Plaintiff asserts that he was never interviewed by Sgt. Norton but was interviewed by Lt. Hobart. See ECF No. 59 at 1-2.

- In support of their motion for summary judgment, defendants submitted the declaration of defendant Baker.  ECF No. 63-1 at 55-57.  In his declaration, Baker describes his involvement in the October 10, 2012 incident:

> On October 10, 2012, I responded to an alarm in Facility B's Enhanced Outpatient Treatment Center where I noticed several officers trying to restrain inmate Grigsby, who was struggling with officers . . . In order to assist officers in gaining control of Grigsby, I grabbed Grigsby's right arm using both hands and pulled it from underneath him, and placed it behind his back.  Grigsby continued to resist, so I placed by right knee on Grigsby's right shoulder to prevent Grigsby from pulling away while Officer Munguia tried to secure handcuffs . . .  Once Grigsby was secured in handcuffs I removed by knee from Grigsby's rights shoulder and tried to help Grigsby to stand up . . .  Several officers and I carried Grigsby out of the hallway and laid him face down on the ground . . . Grigsby was placed on a stokes litter and then onto a rolling gurney.  Using the rolling gurney, I escorted Grigsby to Facility B's Triage and Treatment area, where Grigsby was seen by medical staff . . .

Id. at 56.

iv.  Discussion

Defendant Baker argues that plaintiff's claims against Baker are unexhausted because in his administrative grievance, plaintiff "failed to meet the specificity requirement of the regulations requiring him to name the staff members involved and to describe their involvement in the issue."  ECF No. 52 at 4.  Defendant relies on Cal. Code Regs. tit. 15, § 3084.2(a)(3), which provides that inmates "shall list all staff member(s) involved and shall describe their involvement in the issue."

It is undisputed that plaintiff did not name defendant Baker in the appeal plaintiff filed regarding the October 10, 2012 "excessive force incident."  See ECF No. 59 at 19-20.  However, to the extent defendant argues that plaintiff failed to comply with a procedural requirement by not naming Baker in his appeal, this deficiency is not necessarily fatal to plaintiff's claim.  See Reyes, 810 F. 3d at 658 ("if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process," then the prisoner has exhausted "such administrative remedies as are available" under the PLRA).  In Reyes, the Ninth Circuit recounted the purposes of the PLRA exhaustion requirement:

////

18

> The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. Requiring exhaustion provides prison officials a fair opportunity to correct their own errors and creates an administrative record for grievances that eventually become the subject of federal court complaints. Requiring inmates to comply with applicable procedural regulations furthers these statutory purposes.

Id. at 657. The Court of Appeals reasoned, however, that "when prison officials address the merits of a prisoner's grievance instead of enforcing a procedural bar, the state's interests in administrative exhaustion have been served. Prison officials have had the opportunity to address the grievance and correct their own errors and an administrative record has been developed." Id. Stated differently, the Court found:

> When prison officials opt not to enforce a procedural rule but instead decide an inmate's grievance on the merits, the purposes of the PLRA exhaustion requirement have been fully served: prison officials have had a fair opportunity to correct any claimed deprivation and an administrative record supporting the prison's decision has been developed. Dismissing the inmate's claim for failure to exhaust under these circumstances does not advance the statutory goal of avoiding unnecessary interference in prison administration. Rather, it prevents the courts from considering a claim that has already been fully vetted within the prison system.

Id. at 658.

In the instant case, it is undisputed that plaintiff's November 9, 2012 appeal was pursued to the third level of review, where a decision was rendered on the merits of plaintiff's claim. See ECF No. 53-1 at 20-21. While plaintiff's grievance mentions four officers by name, the subject of the grievance as a whole is the "excessive force incident" that allegedly occurred on October 10, 2012. Broadly construed, this grievance covers all force that was used on plaintiff during the October 10, 2012 incident. Here, it is undisputed that defendant Baker was one of the officers who applied force to plaintiff during this incident. In his declaration, Baker states that on October 10, 2012 he arrived and saw officers struggling with and attempting to restrain plaintiff. In order to assist the other officers, Baker grabbed plaintiff's right arm and pulled it from underneath plaintiff's body, and placed it behind his back. Baker then used his knee to prevent plaintiff from

19

1    pulling away while another officer tried to handcuff plaintiff.  ECF No. 63-1 at 56.  Accordingly,

2    defendant Baker clearly participated in the incident that forms the basis of plaintiff's November 9,

3    2012 "excessive force" grievance.

4           Furthermore, the record establishes that prison officials were aware of defendant Baker's

5    involvement in the October 10, 2012 incident.  Prison officials conducted an investigation in

6    relation to the October 10, 2012 incident, both as part of plaintiff's grievance inquiry and in

7    relation to the disciplinary violation that plaintiff was charged with as a result of the October 10,

8    2012 incident.  Plaintiff alleges that during his interview regarding the "excessive force incident,"

9    plaintiff mentioned defendant Baker's involvement.  Moreover, it is clear from the record that

10   Baker himself was interviewed in connection with the October 10, 2012 incident, as Baker's

11   description of the incident was used as evidence at plaintiff's disciplinary hearing on November

12   16, 2012.  Thus, the record demonstrates that prison officials investigated the entire October 10,

13   2012 incident, not just the specific allegations contained in plaintiff's grievance, and became

14   aware of Baker's involvement during this process.  Cf. Maldonado v. Padilla, Case No. 115-CV-

15   00836 DAD MJS PC, 2016 WL 866281, at *3 (E.D. Cal. Mar. 7, 2016) (finding that plaintiff

16   failed to exhaust administrative remedies where neither plaintiff's grievance nor the prison

17   officials' investigation revealed that anyone besides the lone defendant named in the grievance

18   was involved in the incident being grieved).

19          In the instant case, there is no doubt that despite plaintiff's failure to name Baker in his

20   appeal, prison officials were on notice of Baker's involvement in the October 10, 2012 "excessive

21   force incident," which is the subject of the instant lawsuit.  Through plaintiff's "excessive force"

22   grievance and the related investigations, prison officials learned of Baker's involvement and were

23   afforded a fair opportunity address the issue internally, correct the error, and create an

24   administrative record, thus meeting the requirements of the PLRA's exhaustion requirement.

25   Under these circumstances, dismissing plaintiff's claims against defendant Baker for failure to

26   exhaust would not serve the goals of the exhaustion requirement but would merely "prevent[] the

27   court[] from considering a claim that has already been fully vetted in within the prison system."

28   See Reyes, 810 F.3d at 658.  For these reasons, the undersigned finds that defendant Baker should

1    not be granted summary judgement on exhaustion grounds.

2                C. Merits

3          Defendants Baker, Fairbanks/Balque, Lee, Munguia, and Serrano move for summary

4    judgment on the grounds that they did not violate plaintiff's rights under the Eighth Amendment

5    and alternatively that they are entitled to qualified immunity.

6                i. Legal Standards Governing Eighth Amendment Claims

7          "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places

8    restraints on prison officials, who may not . . . use excessive physical force against prisoners."

9    Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Hudson v. McMillian, 503 U.S. 1 (1992)).

10   "[W]henever prison officials stand accused of using excessive physical force in violation of the

11   [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith

12   effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson,

13   503 U.S. at 6-7 (citing Whitley v. Albers, 475 U.S. 312 (1986)).

14         When determining whether the force was excessive, the court looks to the "extent of the

15   injury suffered by an inmate . . . , the need for application of force, the relationship between that

16   need and the amount of force used, the threat 'reasonably perceived by the responsible officials,'

17   and 'any efforts made to temper the severity of a forceful response.'" Hudson, 503 U.S. at 7

18   (citing Whitley, 475 U.S. at 321).  While de minimis uses of physical force generally do not

19   implicate the Eighth Amendment, significant injury need not be evident in the context of an

20   excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to

21   cause harm, contemporary standards of decency always are violated." Hudson, at 9 (citing

22   Whitley, 475 U.S. at 327).

23         The extent of injury suffered by the plaintiff may indicate the amount of force applied.

24   Wilkins v. Gaddy, 559 U.S. 34, 37 (2010).  "[N]ot 'every malevolent touch by a prison guard

25   gives rise to a federal cause of action.'" Id. (quoting Hudson, 503 U.S. at 9).

26         The Eighth Amendment's prohibition of 'cruel and unusual'
     punishments necessarily excludes from constitutional recognition
27   *de minimis* uses of physical force, provided that the use of force is
     not of a sort repugnant to the conscience of mankind.  An inmate
28

                                          21

1
2
3

> who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim. Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts."

4      Wilkins, 559 U.S. at 37-38 (internal citations and some internal quotation marks omitted).

5          Excessive force cases often turn on credibility determinations, and the excessive force

6      inquiry "'nearly always requires a jury to sift through disputed factual contentions, and to draw

7      inferences therefrom.'" Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (quoting

8      Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)).  Therefore, "summary judgment or judgment

9      as a matter of law in excessive force cases should be granted sparingly."  Id.  The Ninth Circuit

10     has "held repeatedly that the reasonableness of force used is ordinarily a question of fact for the

11     jury." Liston v. Cnty. of Riverside, 20 F.3d 965, 976 n.10 (9th Cir. 1997) (citations omitted).

12                          ii.   Arguments of the Parties

13         Defendants claim that plaintiff was being disruptive and verbally abusive towards staff,

14     that he took a fighting stance when approached by officers, and that he refused to comply with

15     orders to return to his group room, to submit to handcuffs, and to stop resisting.  ECF No. 52 at 1,

16     5-10.  Defendants argue that while force was used on plaintiff, the force used was both necessary

17     and appropriate to maintain control of the situation.

18         In his verified complaint,[13] plaintiff asserts that he was complying with orders to return to

19     his group room, and that defendant Munguia pepper sprayed him for no reason after plaintiff said

20     he was walking as fast as he could go on his crutches.  ECF No. 1 at 3-4.  Plaintiff appears to

21     agree that he did not submit to orders to "turn around and cuff up," but argues that it was because

22     he was blind from the pepper spray and struggling to stand after defendant Munguia took

23     plaintiff's crutches.  See id. at 4.  Plaintiff argues that both the type and degree of force used was

24

25     _____

       [13]  Plaintiff's opposition to defendants' motion for summary judgment contains little argument
26     regarding the merits of defendants' motion.  See ECF No. 59.  Accordingly, the undersigned
       relies on the allegations in plaintiff's verified complaint, ECF No. 1.  See Lopez, 203 F.3d at
27     1132 n.14 (plaintiff's verified complaint may be considered as an affidavit in opposition to
       summary judgment if it is based on personal knowledge and sets forth specific facts admissible in
28     evidence).

                                                    22

excessive considering that plaintiff was complying with the order to return to his group room, was

not threatening any of the officers, and was already unable to walk on his own due to his ankle

injury.  See id. at 4-5.

### iii.   Undisputed Facts

The court finds the following facts to be undisputed:[14]

- At all times relevant to the complaint, plaintiff was an inmate incarcerated at California State Prison – Sacramento.   Facts at ¶ 15.

- On October 10, 2012, plaintiff approached the officers' desk area in the Enhanced Outpatient Treatment Center hallway.  Facts at ¶ 15.  At this time, defendant Serrano and Lee were at the officers' desk.  Id.  Defendant Munguia was also present.  Facts ¶ 19.

- Plaintiff asked defendant Lee for a porter position.  Facts at ¶ 15.

- Defendant Serrano replied,[15] and plaintiff made a disrespectful comment to defendant Serrano.  Facts ¶¶ 17-18; ECF No. 1 at 4.

- Plaintiff was told to return to his group room.  Facts ¶ 16.

- Plaintiff began walking away from the desk towards his group room using his crutches.  ECF No. 1 at 4; Serrano Declr. ¶¶ 5-6.

- Defendant Munguia told plaintiff to return to his group room several times.[16]  ECF No. 53-1 at 44 (Declaration of M. Munguia) ("Munguia Declr."); ECF No. 1 at 4.

- Before plaintiff reached his group room, he turned around and made a comment.[17]

- Munguia approached plaintiff and discharged his pepper spray in plaintiff's face.[18]

---

[14]  Relevant factual disputes are noted.

[15]  Defendants contend that Serrano told plaintiff it was not an appropriate time to discuss a job. ECF No. 53-1 at 40 (Declaration of K. Serrano) ("Serrano Declr.").  Plaintiff contends that Serrano said that plaintiff used to steal canteen from EOP inmates, and the officers laughed.  ECF No. 1 at 3-4.

[16]  The parties agree that plaintiff was told to return to his group room three times, but dispute what occurred as the orders were given.  Plaintiff contends that Munguia followed him and gave the orders as plaintiff was walking away towards his group room.  ECF No. 1 at 4.  Defendants contend that plaintiff was given the orders because he was being loud and disrespectful and stopped to yell at defendants.  See Serrano Declr. ¶¶ 5-8.

[17]  Defendants contend that plaintiff stopped, turned around, and yelled "Fuck you!"  Serrano Declr. ¶ 6.  Plaintiff denies that he swore at Serrano.  Plaintiff contends that in response to being told to return to his group room for the third time as he was walking, plaintiff stopped and said, "I'm moving as fast as I can."  ECF No. 1 at 4.

- Serrano activated her personal alarm.  Serrano Declr. at ¶ 17.

- In response to the pepper spray, plaintiff said, "Oh, what the fuck you pepper spray me for?"  Facts ¶ 33.

- Plaintiff was ordered to submit to handcuffs.  Facts ¶ 33; ECF No. 1 at 4.

- Plaintiff was separated from his crutches. [19]  ECF No. 1 at 4.

- Plaintiff did not make efforts to submit to handcuffs.  Munguia Declr. at ¶ 11.  See ECF No. 1 at 4-5.

- Munguia positioned himself behind plaintiff wrapped his arms around plaintiff.[20]  Serrano Declr. at ¶ 19; ECF No. 1 at 4.

- Plaintiff was taken to the floor by defendants Munguia, Serrano, and Lee.  Serrano Declr. at ¶¶ 19-21; ECF No. 53-1 at 48 (Declaration of L. Lee) ("Lee Declr."); ECF No. 1 at 4.

- Defendant Fairbanks/Balque hit plaintiff with her expandable baton four times.[21]  ECF No. 53-1 at 52 (Declaration of D. Fairbanks) ("Fairbanks Declr.); ECF No. 1 at 4.

- During this time, defendants told plaintiff to stop resisting.  Facts ¶ 36.

- Defendant Baker responded to the alarm, and was physically involved in getting

[18]  The parties agree that plaintiff was pepper sprayed, but dispute what occurred that prompted Munguia to use his pepper spray.  Plaintiff contends that Munguia sprayed him immediately after plaintiff said, "I'm moving as fast as I can."  ECF No. 1 at 4.  Defendants contend that Munguia had approached plaintiff to tell him that his demeanor was unacceptable.  Munguia Declr. at ¶ 6.  Plaintiff took an aggressive stance and passed a crutch from one hand to the other, so Munguia ordered plaintiff to submit to handcuffs.  Id. at ¶¶ 7-8.  Plaintiff began yelling and asked what Munguia would do if plaintiff did not comply.  Id. at ¶ 9.  Defendants contend that Munguia gave plaintiff another order to submit to handcuffs and plaintiff continued yelling, so Munguia used his pepper spray on the left side of plaintiff's face.  Id. at ¶¶ 10-12.
[19]  The parties dispute how plaintiff's crutches were taken from him.  Plaintiff contends that after he was "blinded" by the pepper spray, Munguia told him to cuff up and plaintiff explained that he was on crutches and could not walk without them.  Plaintiff then heard Munguia knock the crutches out of his hands, leaving plaintiff hopping in place.  ECF No. 1 at 4.  Defendants contend that after plaintiff was ordered to submit to handcuffs, plaintiff swung his crutch at Munguia's head.  Munguia Declr. at ¶ 13.
[20]  The parties dispute where Munguia placed his arms.  Plaintiff contends that Munguia put him in a choke hold and started choking him.  ECF No. 1 at 4.  Defendants contend that Munguia placed his arms around plaintiff's torso.  Serrano Declr. at ¶ 19.
[21]  The parties agree that Fairbanks/Balque hit plaintiff four times, but dispute whether Fairbanks/Balque hit plaintiff more than four times.  Specifically, plaintiff alleges that Fairbanks/Balque and Lee together hit plaintiff "over thirty times."  ECF No. 1 at 4.

plaintiff to submit to handcuffs.  ECF No. 53-1 at 56 (Declaration of E. Baker) ("Baker Declr."").  Defendant Baker used his knee to get plaintiff to submit to handcuffs.[22]  Id. at ¶ 7.  Defendant Baker's actions caused plaintiff to "release his hand from underneath his body."[23]  ECF No. 53-1 at 32; Baker Declr. at ¶ 6.

- Plaintiff was handcuffed while he was on the ground on stomach.  See Baker Declr. at ¶¶ 9-10; ECF No. 1 at 4-5.

- Plaintiff was thereafter placed in additional restraints.[24]  Baker Declr. at ¶¶ 11-13; ECF No. 1 at 4.

- As a result of the October 10, 2012 incident, plaintiff suffered a contusion of the left knee and fractured patella.[25]  See ECF No. 1-4 at 11-12.  During the following week, plaintiff had fluid drained from his left knee.  His knee was put in a cast, which he was directed to wear for three to four weeks.[26]  See id.

    iv.  Plaintiff's Verified Allegations

- On October 10, 2012, plaintiff was on crutches due to an ankle injury.  ECF No. 1 at 4.  Plaintiff could not walk without the help of crutches or a wheelchair.  Id.

- After plaintiff asked Lee about a prison job, Serrano made a comment that plaintiff used to steal canteen from EOP inmates and Lee, Serrano, and Munguia laughed. ECF No. 1 at 3-4.

- Plaintiff made comments about Serrano having a sexual relationship with another officer, which upset Lee, Serrano, and Munguia and caused them to stop laughing. Id. at 3-4.

- As plaintiff started walking back to his group room, Munguia followed him, telling plaintiff a second time to return to his group room.  Id.

- When plaintiff was approximately four feet from his group room, Munguia told him a third time to return to his group room.  Id.  At this point, plaintiff turned around and said, "I'm moving as fast as I can."  Munguia then pulled out his pepper spray and sprayed plaintiff in the face.  Id.

---

[22]  Defendants contend that while plaintiff was on the floor on his stomach, Baker put his knee on plaintiff shoulder to restrain him so that Munguia could secure handcuffs on plaintiff.  Baker Declr. at ¶¶ 7-9.  Plaintiff contends that Baker purposely kneed him in the right eye.  ECF No. 1 at 4.

[23]  Defendants contend that Baker pulled plaintiff's arm out from underneath his body.  Baker Declr. at ¶ 6.  Plaintiff contends that "released his hand" because Baker kneed him in the eye. ECF No. 53-1 at 32.

[24]  Defendants contend that plaintiff refused to walk after he was handcuffed, so he was placed in leg restraints and a spit mask.  Plaintiff contends that he was "hog tied."

[25]  The parties dispute whether plaintiff received any injuries beyond a fractured patella.

[26]  Plaintiff contends that he wore the cast for nine weeks.  See ECF No. 1 at 3.

- When Munguia told plaintiff to submit to handcuffs after he had been pepper sprayed, plaintiff was blind from the pepper spray and explained to Munguia that he could not walk without his crutches.  Id.

- Munguia knocked the crutches out of plaintiff's hands, saying plaintiff did not need them and ordering plaintiff to turn around and cuff up.  Id.

- Munguia grabbed plaintiff and tried to spin him around to handcuff him, and plaintiff yelled at Munguia to hand him his crutches.  Id.

- Munguia then put plaintiff in a choke hold and began choking him.  Id.

- While plaintiff was in the choke hold, Serrano started hitting plaintiff with iron batons, saying "stop resisting, stop resisting" and trying to put plaintiff's hands behind his back.  Id.

- Plaintiff struggled to breathe and briefly lost consciousness, and at some point hit his head on the ground.  Id.

- When plaintiff awoke, Fairbanks/Balque, Lee, and Serrano were hitting him with iron batons.[27]  Id.

- Plaintiff asked why they were hitting him, but they did not respond.  Id.

- With Munguia's help, Serrano hit plaintiff with her baton "several times."  Id. at 5.

- Lee and Balque hit plaintiff "over 30 times" with their batons, "all over [plaintiff's] legs, thighs, and knees until one of them broke [his] knee cap."  Id.

- While plaintiff was on his stomach asking for medical attention and the officers were trying to handcuff him, Officer Baker told plaintiff to stop resisting and then kneed plaintiff in the right eye.  Id. at 4; ECF No. 53-1 at 32.

- After plaintiff was handcuffed, Baker said, "hog tie him."  ECF No. 59 at 48.

- Plaintiff told Baker that his left knee was hurting and that something was wrong, but plaintiff was ignored.  Id. at 48-49.

- Plaintiff was then "hog tied," bending plaintiff's injured left leg at the knee and causing him severe pain.  Id. at 48-89, ECF No. 1 at 4-5.

- Plaintiff screamed and told defendants something was wrong with his knee.  ECF No. 59 at 49.

- In his deposition, plaintiff stated that he could have submitted to handcuffs if Munguia had not kicked his crutch out of his hand.  ECF No. 53-1 at 33.

---

[27]  It appears that plaintiff was on the ground at this point.

- Plaintiff further stated that after Munguia started "choking [him] out," they were "in a fight." Id. at 32-33.

- Plaintiff stated that Munguia was "abusing his authority" and that plaintiff "wasn't listening." Id. at 33.

    v. Defendants' Evidence

Although already noted above in the undisputed facts section, the court summarizes defendants' evidence below in order to provide a more cohesive account of defendants' version of the facts.

- After Serrano informed plaintiff that this was not the time to discuss a job assignment, plaintiff then became angry, loud, and disrespectful to Serrano. Facts ¶¶ 16-18.

- As plaintiff began walking towards his group room, plaintiff stopped, turned around, and yelled, "Fuck you!" ECF No. 53-1 at 40 (Declaration of K. Serrano) ("Serrano Declr.").

- Plaintiff was given multiple orders to return to his group room, but stopped in front of his group room and refused to go in. ECF No. 53-1 at 44 (Declaration of M. Munguia) ("Munguia Declr.").

- Munguia approached plaintiff and informed plaintiff that his language and demeanor towards staff was unacceptable. Id. at ¶ 6.

- Plaintiff began yelling and asking what Munguia would do if plaintiff did not comply. Id. at ¶¶ 9-11.

- Munguia gave plaintiff another order to turn around and submit to handcuffs, and plaintiff shouted, "no!" and moved his crutch in front of his body. ECF No. 53-1 at 48 (Declaration of L. Lee) ("Lee Declr.").

- Munguia then pepper sprayed plaintiff in the face, which appeared to have no impact on plaintiff. Id. at ¶ 9.

- Plaintiff lunged at Munguia and swung his crutch at Munguia's head. Serrano Declr. at ¶ 18.

- Munguia positioned then himself behind plaintiff and wrapped his arms around plaintiff's upper torso. Id. at ¶ 19. Plaintiff was ordered not to resist, but he did not comply.

- Serrano, Lee, and Munguia struggled to take plaintiff to the floor, where they forced him onto his stomach. Plaintiff continued to struggle and jerk his body around despite the repeated orders to submit to handcuffs and stop resisting.

27

Serrano Declr. at ¶¶ 13, 17-18; Lee Declr. at ¶ 12; Munguia Declr. at 16; Fairbanks Declr. at ¶ 12.

- Fairbanks/Balque shouted, "Grigsby! Cuff-up!  Cuff-up!"  Plaintiff did not comply, so Fairbanks/Balque used an expandable baton and hit plaintiff in the left calf area approximately four times.  Id. at ¶¶ 13-16.  Plaintiff continued to resist. Serrano Declr. at ¶ 17.

- Defendant Baker, who had responded to the alarm, grabbed plaintiff's right arm, pulled it from underneath plaintiff, and placed it behind plaintiff's back.  Baker Declr. at ¶¶ 3-6.

- Baker placed his right knee on plaintiff's right shoulder while Munguia tried to handcuff plaintiff.  Id. at ¶ 7.  Once plaintiff was placed in handcuffs, Baker removed his knee from plaintiff's shoulder and tried to help him stand up.  Id. at ¶ 9.

- Plaintiff refused to walk, so Baker and other officers carried plaintiff into the hallway and laid him face down on the ground.  Id. at ¶¶ 9-10.  Plaintiff was not "hog-tied," but was placed in leg restraints and a spit mask. Id. at ¶ 11-12.

- Once fully restrained, plaintiff was placed on a rolling gurney and taken to the Triage and Treatment Center.  Id. at ¶¶ at13-14.

### D.  Excessive Use of Force

#### i.  Injury Suffered by Plaintiff

The nature and extent of plaintiff's injury, while not dispositive, must be considered in determining whether the evidence supports a reasonable inference that defendants' alleged use of force was motivated by malicious or sadistic intent.  See Hudson, 503 U.S. at 7 (court must consider the "extent of the injury").  "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.  An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."  Wilkins, 559 U.S. at 38.

Plaintiff contends that he was temporarily blinded by pepper spray, "choked unconscious," and beaten "black and blue" until his kneecap was broken.  The medical records attached to plaintiff's complaint confirm that plaintiff suffered a contusion of the left knee and a fractured patella, and that plaintiff wore a cast for at least three to four weeks.  Plaintiff also

claims that he suffered severe pain as a result of being "hog tied" with his injured leg bent and that he had a "huge knot" on his head as a result of his head hitting the ground.  Defendants assert in their declarations that plaintiff did not lose consciousness and was not choked or "hog tied," but do not seriously contend that plaintiff's injuries were de minimis.  Accordingly, this factor weighs in plaintiff's favor.

### ii.  Need for Application of Force

An inmate's refusal to comply with orders may present a threat to the safety and security of a prison.  Lewis v. Downey, 581 F.3d 467, 476 (7th Cir. 2009); Whitley, 475 U.S. at 320-22; Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979).

> Orders given must be obeyed.  Inmates cannot be permitted to decide which orders they will obey, and when they will obey them .
> . . .  Inmates are and must be required to obey orders.  When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials.  Such refusal and denial of authority places the staff and other inmates in danger.

Lewis, 581 F.3d at 476 (quoting Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984)).

Plaintiff appears to admit that he was verbally disrespectful to Officer Serrano, which prompted the order for plaintiff to return to his group room.  However, plaintiff contends that he complied with this order and started walking back to his group room on his crutches.  If plaintiff's version of the facts is true, there was no indication that physical force was necessary or justified since plaintiff was complying with the order and had almost reached his group room when Munguia discharged his pepper spray.  Accordingly, this factor tips in plaintiff's favor with respect to whether there was a need for Munguia to use force on plaintiff to get him to return to his group room.

Whether force was necessary to bring plaintiff into compliance with the orders to submit to handcuffs is a closer question.  It is undisputed that after Munguia used his pepper spray on plaintiff and ordered plaintiff to "turn around and cuff up," plaintiff did not turn around and submit to handcuffs but instead asked why he had been sprayed.  However, plaintiff also alleges that he was "blind" at the time because of the pepper spray; that Munguia kicked plaintiff's

1    crutches away, causing plaintiff to hop in place and struggle to stand; and that when Mungia

2    attempted to grab him, plaintiff yelled at Munguia to give him his crutches.  Construed in

3    plaintiff's favor, these allegations suggest that plaintiff was unable to comply with Munguia's

4    orders to submit to handcuffs because he could not see and was not able to stand on his own

5    without his crutches.  Thus, plaintiff's version of the facts suggests that by spraying plaintiff with

6    pepper spray and taking his crutches, Munguia created a situation in which plaintiff was unable to

7    immediately comply with the orders Munguia gave.[28]  Under these circumstances, Munguia

8    cannot use plaintiff's failure to comply to assert that further application was force was needed.

9    Nevertheless, in light of plaintiff's statement in his deposition that he did not turn around and cuff

10   up when ordered to do so and that he "wasn't listening" to orders once Munguia started "choking

11   [plaintiff] out," it is arguable that some force was justified to get plaintiff to submit to handcuffs.

12        Plaintiff also admits that defendants Serrano, Lee, and Fairbanks ordered him to stop

13   resisting, and that plaintiff was not handcuffed until defendant Baker kneed plaintiff in the eye as

14   plaintiff was lying on the ground, causing plaintiff to "release his hand from underneath his

15   body."  These allegations suggest that until plaintiff was kneed by Baker, plaintiff had not made

16   efforts to submit to handcuffs, which further suggests that some force was necessary to get

17   plaintiff to submit to handcuffs.

18        Overall, while the undisputed facts suggest that some force was necessary to obtain

19   compliance, the facts material to a determination how much force was necessary are disputed.

20                    iii.   Relationship Between Need for Force and Amount of Force Used

21        In determining whether there has been an Eight Amendment violation, the standard is

22   "malicious and sadistic force, not merely objectively unreasonable force."  Clement v. Gomez,

23   298 F.3d 898, 903 (9th Cir. 2002); Hudson, 503 U.S. at 9 (not every malevolent touch gives rise

24   to an Eighth Amendment claim).  "The infliction of pain in the course of a prison security

25   measure, therefore, does not amount to cruel and unusual punishment simply because it may

26

27   [28]  In his deposition, plaintiff was asked whether he should have just complied when given orders
     to "cuff up and stop struggling."  Plaintiff responded, "Well, I think I could have done that if they
28   would have let me keep my crutch."  ECF No. 53-1 at 32.

                                              30

1   appear in retrospect that the degree of force authorized or applied for security purposes was

2   unreasonable, and hence unnecessary in the strict sense."  Whitley, 475 U.S. at 319.

3        With respect to the use of pepper spray, plaintiff 's allegations suggest that he was

4   complying with Munguia's orders to return to his group room and had stopped to say he was

5   moving as fast as he could when Munguia used his pepper spray on plaintiff.  According to

6   plaintiff, Munguia did not order plaintiff to submit to handcuffs until after he used his pepper

7   spray.  On these facts, there is no indication that any physical force was necessary as plaintiff was

8   in the process of complying with Munguia's order to return to his group room.  As to Munguia's

9   use of pepper spray, this factor tips in plaintiff's favor.

10       As to the remaining allegations, it is undisputed that after Munguia used his pepper spray

11  and ordered plaintiff to "cuff up," plaintiff did not comply but said he could not see and asked

12  why he was sprayed.  Given plaintiff's allegations that when Munguia attempted to grab plaintiff,

13  plaintiff yelled at Munguia to give him his crutches, defendants could have reasonably believed

14  that plaintiff did not intend to comply with orders to submit to handcuffs, necessitating some level

15  of force.  However, in light of plaintiff's allegations that he never lunged at any of the officers or

16  attempted to use his crutch as a weapon before he was "choked out" and beaten repeatedly with

17  batons until his kneecap was broken, and his allegation that Baker kneed plaintiff in the eye while

18  lying on the ground asking for medical attention, there is a material dispute as to whether the

19  force used against plaintiff was excessive in light of the perceived threat.  There is also a dispute

20  as to whether plaintiff was subsequently "hog tied" and whether the restraints used on plaintiff

21  were excessive given plaintiff's allegations that he was unable to walk on his own due to his

22  "broken kneecap" and his prior ankle injury that necessitated the use of crutches.

23       This factor weighs in plaintiff's favor.

24            iv.  Threat Perceived by Defendants

25       The fourth Hudson factor considers "the extent of the threat to the safety of staff and

26  inmates, as reasonably perceived by the responsible officials on the basis of the facts known to

27  them."  Whitley, 475 U.S. at 321.  In weighing this factor, courts should be mindful that "in

28  making and carrying out decisions involving the use of force to restore order in the face of a

1    prison disturbance, prison officials undoubtedly must take into account the very real threats the

2    unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates

3    against whom force might be used." Id. at 320.

4          As already discussed, the court does not find it reasonable for Munguia to have perceived

5    a threat from plaintiff when plaintiff was walking back to his group room.  Even assuming that

6    plaintiff was walking slowly due to his crutches and that he stopped to tell Munguia he was

7    moving as fast as he could, plaintiff was in the process of complying with Munguia's order to

8    return to his group room.  This factor weighs in plaintiff's favor against Munguia.

9          As discussed above, with respect to the remaining allegations, plaintiff admits that after he

10    was pepper sprayed and told to submit to handcuffs, he asked why he should cuff up, hopped in

11    place, and yelled at Munguia.  In light of plaintiff's reaction to being told to cuff up, it was

12    reasonable for defendants to believe that plaintiff was not going to submit to handcuffs and that

13    some threat therefore existed.  However, there is a dispute as to the extent of the threat perceived.

14    According to plaintiff's version of the facts, plaintiff hopped and yelled for his crutches because

15    he could not stand, and did not at any point become physically aggressive or attempt to attack any

16    of the officers.  Plaintiff's account of the facts suggests that although he did not offer to submit to

17    handcuffs, he remained relatively passive while he was choked, beaten with batons, and kneed in

18    the eye.  Accordingly, this factor weighs in defendants' favor, but only slightly.

19                   v.   Efforts Made to Temper Severity of Force

20          Whether defendants attempted to temper the severity of the force used upon plaintiff is

21    entirely dependent upon which version of the facts is believed.  In plaintiff's version of the facts,

22    which must be taken as true for the purposes of summary judgment, defendant Munguia used

23    pepper spray on plaintiff where little if any force was necessary.  Plaintiff's allegations that

24    Munguia choked him until he lost consciousness; that Serrano, Lee, and Fairbanks/Balque beat

25    him with batons, even while he was briefly unconscious; and that Baker kneed plaintiff in the eye

26    while he was lying on the ground asking for medical attention, suggest that defendants made little

27    effort to temper the severity of the force used.  Plaintiff's allegations that he was "hog tied" with a

28    "broken kneecap" when he already could not walk on his own suggests that plaintiff was

1    deliberately restrained in a manner that would cause him harm.  This factor tips in plaintiff's

2    favor.

3                          vi.  Conclusion

4          For these reasons, the court finds material issues of fact as to whether defendants' use of

5    force against plaintiff was excessive and in violation of plaintiff's Eighth Amendment rights.

6    Summary judgment should therefore be denied.

7              E.  Qualified Immunity

8          Government officials are immune from civil damages "unless their conduct violates

9    'clearly established statutory or constitutional rights of which a reasonable person would have

10   known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457

11   U.S. 800, 818 (1982)).  In analyzing a qualified immunity defense, the court must consider the

12   following: (1) whether the alleged facts, taken in the light most favorable to the plaintiff,

13   demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether

14   the right at issue was clearly established at the time of the incident.  Saucier v. Katz, 533 U.S.

15   194, 201 (2001) overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling

16   Saucier's requirement that the two prongs be decided sequentially).  These questions may be

17   addressed in the order most appropriate to "the circumstances in the particular case at hand."

18   Pearson, 555 U.S. at 236.  Thus, if a court decides that plaintiff's allegations do not support a

19   statutory or constitutional violation, "there is no necessity for further inquiries concerning

20   qualified immunity."  Saucier, 533 U.S. at 201.  On the other hand, if a court determines that the

21   right at issue was not clearly established at the time of the defendant's alleged misconduct, the

22   court need not determine whether plaintiff's allegations support a statutory or constitutional

23   violation.  Pearson, 555 U.S. at 236, 242.

24         The court has already established that, taken in the light most favorable to plaintiff, the

25   allegations demonstrate a violation of plaintiff's Eighth Amendment rights.  The first prong of the

26   analysis is therefore resolved in plaintiff's favor.

27         With respect to whether there was a clearly established right, the law at the time of the use

28   of force was clear that force used sadistically and maliciously for the very purpose of causing

                                        33

1   harm violated the Eighth Amendment.  Whitley, 475 U.S. at 320-21.  "[S]ummary judgment

2   based on qualified immunity is improper if, under the plaintiff's version of the facts, and in light

3   of the clearly established law, a reasonable officer could not have believed his conduct was

4   lawful."  Schwenk v. Hartford, 204 F.3d 1187, 1196 (9th Cir. 2000) (citing Grossman v. City of

5   Portland, 33 F.3d 1200, 1208 (9th Cir. 1994)).  The disputed issues of fact surrounding the degree

6   and type of force used in this case preclude a finding that defendants are entitled to qualified

7   immunity, because a reasonable officer would not have believed that it was lawful to use force on

8   plaintiff for the purpose of inflicting harm.

9       Because there are disputed issues of material fact, defendants Baker, Munguia, Serrano,

10  Lee, and Fairbanks/Balque's motion for summary judgment should be denied.  Moreover, due to

11  the nature of the factual disputes, defendants are not entitled to qualified immunity.

12  VII.    Motion for Settlement Conference

13      Plaintiff filed a motion for a settlement conference indicating his willingness to settle the

14  case instead of going to trial.  See ECF No. 61 at 1.  Defendants filed an opposition to plaintiff's

15  motion, stating that a settlement conference would not be beneficial at this time due to

16  defendants' pending motion for summary judgment.  ECF No. 63 at 2.  Defendants indicated that

17  they remain open to a settlement conference at a later stage of the litigation.  Id. at 3.

18      In light of the court's recommendation that defendants' summary judgment motion be

19  denied, it appears that defendants may be open to the possibility of a settlement conference.

20  Accordingly, plaintiff's motion is granted to the extent that the court will refer plaintiff's case for

21  settlement if the district judge adopts the recommendation to deny summary judgment.

22  VIII.   Motion for Writ of Habeas Corpus Ad Testificandum

23      Plaintiff has also filed a motion for a writ of habeas corpus ad testificandum.  ECF No. 62.

24  As plaintiff's case has not yet been set for trial, plaintiff's motion is premature.  The motion is

25  denied at this time, but plaintiff may re-file his motion should this case proceed to trial.

26  IX.     Conclusion

27      In accordance with the above, IT IS HEREBY ORDERED that:

28      1.   Plaintiff's motions to compel discovery (ECF No. 45 & 49) are granted in part and

denied in part.  The motions are granted to the extent that within twenty-one (21) days of the adoption of the findings and recommendations by the district judge, defendants are directed to file a declaration with the court indicating whether the October 10, 2012 video was altered or edited before plaintiff was permitted to view it, and to produce to plaintiff the excessive use of force report created in relation to the October 10, 2012 incident.  The motions are in all other respects denied;

2. Plaintiff's motion to extend the discovery deadline (ECF No. 49 at 1) is denied;

3. Plaintiff's motion for appointment of counsel (ECF No. 58) is denied without prejudice;

4. Plaintiff's motion for a settlement conference (ECF No. 61) is granted to the extent that the court will refer plaintiff's case for settlement following adoption of the findings and recommendations by the district judge;

5. Plaintiff's motion for a writ of habeas corpus ad testificandum (ECF No. 62) is denied without prejudice to its re-filing should this case proceed to trial.

IT IS FURTHER RECOMMENDED that:

Defendants' motion for summary judgment (ECF No. 52) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court, which shall be captioned "Objections to Magistrate Judge's Findings and Recommendations."  **Due to exigencies in the court's calendar, no extensions of time will be granted.**  A copy of any objections filed with the court shall also be served on all parties.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 9, 2016

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE